UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

BRIGHT HARVESTING, INC.,　　　　　　　　　　　　　　　　No. 15-11178 tr12

　　　Debtor.

In re:

GARY AND GENNIFER BRIGHT,　　　　　　　　　　　　　　No. 15-11179 tr12

　　　Debtors.

## **MEMORANDUM OPINION**

　　　Debtor Bright Harvesting, Inc. is a custom harvester headquartered near Clovis, New Mexico. Debtors Gary and Gennifer Bright own Bright Harvesting, and also own a wheat and sorghum farm in the Clovis area. They filed separate Chapter 12 cases and separate plans of reorganization. The Court held a final hearing on confirmation of both plans, including the objections filed by their main creditor. For the reasons below, the Court concludes the plans should be confirmed if the debtors are willing to amend them as set forth herein.

I.　　　Findings of Fact[1]

The Court makes the following findings of fact:

Bright Harvesting filed its Chapter 12 case on May 5, 2015, and filed its Amended Chapter 12 Plan on October 6, 2015. The Brights filed their Chapter 12 case and amended plan

---

[1] To the extent any finding of fact is construed as a conclusion of law, it is adopted as such, and vice versa. The Court may make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

on the same dates.

For about 20 years, Bright Harvesting has been custom harvesting crops such as wheat and barley for customers in New Mexico, Texas, and Colorado. Bright Harvesting charges about $21 per acre for custom harvesting in New Mexico, about $25 per acre in Texas, and up to $50 per acre for seed canola in Colorado. It also harvests barley in Colorado, charging about $1.00 per hundred pounds.

Bright Harvesting's main assets are a shop and bunk house in Melrose, New Mexico, two combines, a number of combine "headers," a tractor, and various trucks, trailers, and similar rolling stock.

The Brights are the sole managers of Bright Harvesting. They are honest, hard-working farmers, and are assisted by their children. Mr. Bright was the president of the National Sorghum Producers for three years. Meticulous recordkeeping is not the Brights' forte, and this shortcoming has caused some problems with their major creditor, Farm Credit of New Mexico ("Farm Credit").[2]

In addition to their custom harvesting business, the Brights generate income from farming. The Brights own a 1300-acre dryland farm near Melrose, New Mexico (the "Farm"), about 960 acres of which are tillable, with the balance in pastureland. Historically the Brights have planted two crops on their farm each year, sorghum and winter wheat, which they harvest themselves. The farm includes a 1930s-era farmhouse, two tractors, and a Ford pick-up. The Brights also have long-standing sharecropping arrangements with neighbors, the result of which

---

[2] "Farm Credit" refers to two related entities: Farm Credit of New Mexico, FLCA and Production Credit Association of Southern New Mexico, both wholly owned subsidiaries of Farm Credit of New Mexico, ACA.

is that they have 1200 net acres to plant wheat and sorghum.

Both businesses were hurt by the drought in New Mexico in 2012-2014. Before the drought, the debtors' primary obligation to Farm Credit was a $360,000 loan secured by a first mortgage on the Farm (the "Farm Loan"). The loan was originated in 2008 and was modified in 2009. Currently, the interest rate is 4.25% and the annual payment is $27,168.93. The last payment is due August 1, 2028. The current loan balance is about $269,000.

On August 22, 2008, Farm Credit provided the Brights with a $50,000 revolving line of credit (the "Line of Credit"). Over the years, the line limit has increased as follows:

| Year | Line of Credit Amount |
|------|----------------------|
| 2008 | $50,000 |
| 2009 | $100,000 |
| 2010 | $155,000 |
| 2011 | $155,000 |
| 2012 | $200,000 |
| 2013 | $200,000 |
| 2014 | $400,000 |
| 2015 | $500,000 |

The large increases in the line since 2012 were because of the drought. The Line of Credit is secured by a second mortgage on the Farm and a security interest in the equipment owned by the Brights and Bright Harvesting. The current Line of Credit balance is about $482,000, and the interest rate is 5%.

With the Farm Loan and the Line of Credit, the total debt to Farm Credit is about $751,000. The Brights and Bright Harvesting are obligors, and the loans are cross-collateralized.

The Farm is worth approximately $580,000, while the encumbered equipment is worth, net of purchase money liens held by third parties, about $600,000. Thus Farm Credit is oversecured, with a loan to value ratio of about 64%. There is additional collateral as well,

including crops, the shop, and the bunk house. The additional collateral may add $100,000 or so to Farm Credit's collateral package, which would result in a loan to value ratio of about 59%.

To fund the Chapter 12 plans and cut expenses, the Brights plan to sell their newer 2012, a 2012 Case. The tractor is worth about $160,000, and has a purchase money lien of about $58,000. The resulting funds could either be used to pay down the Line of Credit or for payment of farming or harvesting expenses.

The plans provide, inter alia, that each debtor will pay all disposable income to creditors over five years. Both are 100% plans, and discharge is contingent upon payment in full. Farm Credit is to retain all liens and receive minimum payments of $45,000 per year. To the extent Farm Credit is not paid in full by the plan payments, the debtors propose to liquidate collateral, including equipment and the Farm.

Debtors filed the plans in good faith, to reorganize and maintain operations. Based on Farm Credit's current collateral position, the Brights would not lose the Farm if Farm Credit foreclosed now. If the debtors fail to comply with the plans and Farm Credit forecloses in the future, the Farm may have to be sold. The debtors are willing to take that risk for the chance to reorganize.

Farm Credit objected to confirmation, primarily on feasibility grounds. Farm Credit doubts the debtors' ability to perform under the plans because, inter alia, Bright Harvesting failed to make cash collateral payments during the pendency of the case. Under the cash collateral agreement, Bright Harvesting agreed to pay $15,000 in July, 2015; $30,000 in August, 2015; and $30,000 in September, 2015. Bright Harvesting did not make the September payment for two reasons. First, Bright Harvesting missed a three week job during the spring-summer harvesting

-4-
Case 15-11178-t12    Doc 69    Filed 12/04/15    Entered 12/04/15 16:18:04 Page 4 of 19

season because of extremely heavy rainfall in Southwest Texas. Then, the New Mexico grain harvest was delayed because of rain in July, leaving Bright Harvesting with insufficient funds in the fall. Under these circumstances, and because the debtors' long term projections suggest feasibility, the Court finds the default under the cash collateral agreement does not require a finding against feasibility.

## II. Plan Confirmation

### A. Plan Confirmation Requirements.

Section 1225 sets forth the requirements for confirmation of Chapter 12 plans. Debtors bear the burden of establishing all elements. *In re Ames*, 973 F.2d 849, 851 (10th Cir. 1992). The Court also has an "independent duty to ensure that the requirements of [the Bankruptcy Code] are satisfied, even if no objections to confirmation have been made." *In re Young Broad. Inc.,* 430 B.R. 99, 139 (Bankr. S.D.N.Y. 2010) (discussing the duty in Chapter 11); *In re Paige,* 685 F.3d 1160, 1187 (10th Cir. 2012) ("The bankruptcy court has an obligation to scrutinize a plan carefully to determine whether it offers a reasonable prospect of success and is workable.").

The main point in contention is feasibility (§ 1225(a)(6)). Farm Credit also argues that the plans do not comply with § 1225(a)(3) (good faith) or § 1225(a)(5) (full payment of secured claims and lien retention).

### B. Feasibility.

Section 1225(a)(6) provides that a plan may only be confirmed if "the debtor will be able to make all payments under the plan and to comply with the plan."

> To demonstrate feasibility, a debtor must provide reasonable assurances the plan can be achieved, not guarantee its success. [citing *In re Ames*] Cash flow projections are exactly that—projections. Courts examine whether they are based on valid assumptions to determine the likelihood that they will prove true.

> Questions about plan feasibility are resolved by giving the debtor the benefit of the doubt when the projections warrant it.

*In re Woods,* 465 B.R. 196, 209 (10th Cir. BAP 2014), reversed on other grounds, 742 F.3d 689 (10th Cir. 2014).

"Feasibility is a question of fact that necessarily entails a determination of the comparative credibility of experts as well as of the debtor." *In re John V. Francks Turkey Co., Inc.,* 1999 WL 565883, at *3 (10th Cir. BAP 1999). A debtor need not prove to a certainty that its plan will succeed; it must only offer projections that show a reasonable prospect of success. *In re Baker,* 302 B.R. 112, at *2 (10th Cir. BAP 2012) (unpublished Chapter 11 farming case). The "income projections must be based on concrete evidence and must not be speculative or conjectural." *Ames,* citing *In re Novak*, 102 B.R. 22, 24 (Bankr. E.D.N.Y. 1989). In other words, they must "have some basis in fact and experience." *Baker,* 302 B.R. 112, at *2. *See also Inv. Co. of the Southwest, Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006) ("Feasibility determinations must be firmly rooted in predictions based on objective fact.") (citations omitted).

"Many courts have held that a Chapter 12 debtor should be given the benefit of the doubt regarding the issue of feasibility when the debtor's plan projections—using reasonable inputs in light of the current economic climate—indicate that it is reasonably probable that the debtor can satisfy the plan payments." *John V. Francks Turkey Co.*, 1999 WL 565883, at *4, citing *First Nat'l Bank v. Hopwood (In re Hopwood),* 124 B.R. 82, 86 (E.D. Mo. 1991). *See also In re Foertsch,* 167 B.R. 555, 566 (Bankr. D.N.D. 1994) ("When construing feasibility requirements, this court gives Chapter 12 debtors the benefit of the doubt … when the debtor's projections, using reasonable inputs in light of the current economic climate, indicate that it is reasonably probable that the debtors will be able to make the plan payments."); *In re Toso*, 2007 WL

7540985 (9th Cir. BAP 2007) (same).

The evidence in the record relating to feasibility consists of a projection prepared by Mr. Bright, his testimony, and the testimony of Farm Credit's loan officer, Verity Ulibarri.[3]

In determining feasibility, the Court analyzed both farming operations. Although the bankruptcy cases are neither jointly administered nor substantively consolidated, there is substantial overlap of creditor liability and use of assets, and the operations are treated by the debtors as combined for planning purposes. The Court finds that analyzing the feasibility of both operations makes the most sense, and is consistent with the parties' evidence.

Mr. Bright's projections indicate the plans are easily feasible. Farm Credit did a good job of showing, however, that Mr. Bright's projections were optimistic, both in terms of income (actual income likely will be lower) and expense (actual expenses likely will be higher).

Notwithstanding these issues, the Court found Mr. Bright's projections to be a useful starting point. The Court then adjusted the projections as follows, based on the testimony of Mr. Bright and Ms. Ulibarri.

    1.    <u>Projected Farming Income and Expense</u>.

The adjusted projections for operating the Farm are based on the following assumptions, which the Courts finds are reasonable based on the evidence presented at trial: (a) wheat yield will be 20 bushels per acre;[4] (b) net price to the debtors per wheat bushel would average $4.50;[5]

---

[3] The Court found Ms. Ulibarri to be a very knowledgeable, credible witness. Although she was not qualified as an expert witness, she gave a number of opinions, without objection, that the Court found helpful in reaching its decision.

[4] Mr. Bright testified he expected to plant about 1230 acres of winter wheat, with a harvest of at least 20 bushels per acre. The projected wheat yield in the chart includes an adjustment for sharecropping.

(c) out of pocket expenses for planting wheat are $12 per acre,[6] while out of pocket expenses for planting sorghum are $29 per acre;[7] (d) the out of pocket cost of harvesting both crops is $13 per acre;[8] and (e) gross return for sorghum would be $100 per acre.[9] Debtors estimated the crop insurance at $11,000, but the Court doubled that amount because it appeared such figure was only for winter wheat, and did not include a sorghum crop. The living expenses include property tax payments and insurance premiums, except for crop insurance. The Court assumed that during the plan period the Brights would plant both wheat and sorghum, which they typically do.

|  | Acres | Bushels per acre (or cost per acre) | Price per bushel | Income/Expense |
|---|---|---|---|---|
| Wheat Income | 1200 | 20 | $4.50 | $108,000 |
| Wheat planting expense- | 1200 | $12 |  | $14,400 |
| Wheat expense- harvesting | 1200 | $13 |  | $15,600 |
| *Net wheat income:* |  |  |  | *78,000* |
| Sorghum income | 1200 | $100 |  | $120,000 |
| Sorghum planting expenses | 1200 | $29 |  | $34,800 |
| Sorghum harvesting expenses | 1200 | $13 |  | $15,600 |
| *Net sorghum income:* |  |  |  | *$69,600* |
|  |  |  | *Income subtotal:* | *$147,600* |
| Tractor rental expense |  |  |  | $10,000 |
| Crop Insurance |  |  |  | $22,000 |
| Living expenses |  |  |  | $60,000 |

---

[5] Ms. Ulibarri testified that the national price of wheat futures in July 2016 is expected to be $5.40/bushel, and that the price near Clovis, New Mexico would be about $.90/bushel less.

[6] The Court accepted this projection by Mr. Bright, which seems reasonable and was not specifically controverted by Farm Credit.

[7] This figure is based on Ms. Ulibarri's testimony.

[8] This figure is based on Ms. Ulibarri's estimate of out-of-pocket harvesting expenses, not including depreciation.

[9] Ms. Ulibarri testified that farmers can gross a little over $100 per acre for sorghum.

|   |   |   | *Expense subtotal:* | $92,000 |
|---|---|---|---|---|
| Net Available |   |   |   | **$55,600** |

      2.        Projected Harvesting Income and Expense.

The custom harvesting projections are based on the following assumptions, which the Court finds are reasonable: (a) Bright Harvesting would be paid at least $21 per acre for custom harvesting;[10] (b) out of pocket expenses for custom harvesting would average 50% of gross revenue;[11] and (c) Debtor would have enough business to achieve the projected revenue.

| Month | Gross Harvesting Income | Out-of-pocket expenses (50% of gross income) | Net harvesting income |
|---|---|---|---|
| May | $110,000 (5,240 ac.) | $55,000 | $55,000 |
| June | $141,750 (6750 ac.) | $70,875 | $70,875 |
| July | $73,000 (3,476 ac.) | $36,500 | $36,500 |
| August | $22,500 (1,071 ac.) | $11,250 | $11,250 |
| September | $22,500 (1,071 ac.) | $11,250 | $11,250 |
| October | $18,750 (893 ac.) | $9,375 | $9,375 |
| November | $18,750 (893 ac.) | $9,375 | $9,375 |
| Net Available | $407,250 | $203,625 | **$203,625** |

Total revenue available to make plan payments is projected to be **$259,225**.

      3.        Combined Plan Payments.

The annual payments are taken from Mr. Bright's projections, the plans, schedules, and proofs of claim. The payment to the Chapter 12 trustee includes amounts due for administrative, priority, and unsecured claims, and divides by five. The annual payment under the Line of Credit was calculated by fully amortizing the current balance over five years at 5%.

---

[10] Mr. Bright testified he charged at least $21 per acre in New Mexico and a little more in Texas and Colorado.

[11] The Court arrived at this number by increasing Mr. Bright's estimate—which was 35% of revenue—by 15%. The Court finds such increase is reasonable based on Ms. Ulibarri's testimony and Bright Harvesting's historical income and expenses.

| Creditor | Annual Payment |
|---|---|
| Western Bank | $8,000 |
| Bank of the West | $6,000 |
| CNH Capital | $40,000 |
| Farm Credit (line of credit) | $112,000 |
| Farm Credit (farm mortgage) | $27,200 |
| Trustee payment (for priority, administrative, and unsecured creditor claims) | $53,500 |
| Total | **$246,700** |

4. <u>Analysis</u>.

The projections, as adjusted, show that there should be enough net revenue to make all plan payments. The above projections are substantially more conservative than Mr. Bright's: harvesting revenue is cut in half, custom harvesting prices are only $21 per acre, harvesting expenses are increased from about 35% of revenue to 50%, farming expenses are increased, crop insurance is added, tractor leasing costs are added, and the projected wheat price is reduced from $6 to $4.50 a bushel. In a good year, the debtors ought to be able to substantially outperform these projections, while in a bad year they likely would fall short. The plans provide for flexibility and fluctuations from year to year through the minimum payment provisions. Overall, the projections seem reasonable to the Court, and show feasibility over the five year period.[12]

One concern is that the projections do not include any expense for buying a new combine. Bright Harvesting's combines are five years old, and will be ten years old before the last plan payment. It is possible Bright Harvesting will need a new combine before 2020, although that is not certain. Mr. Bright estimated a new combine would cost about $350,000,

---

[12] The budgets do not include any amounts for federal or state income taxes. No evidence was presented on this issue. The Court presumes that no income taxes will be due because of, inter alia, loss carryforwards from prior years.

which he said typically would be financed. If a new combine is needed, the Court finds that the Debtor would be able acquire one. Because of the proposed sale of the 2012 Case tractor, there should be at least $100,000 available for a down payment and annual finance payments. It seems reasonable to assume that the debtors can make it three more years without buying another combine, so the $100,000 should get them through the five-year plan period, after which they will have paid off most of their creditors and have substantially more disposable income than they do now.

  C. <u>Other Objections Under § 1225</u>.

Farm Credit also argued that the plans were not filed in good faith. That objection is overruled. All evidence at trial suggests the debtors proposed the plans in good faith. The debtors filed the plans with the intention of paying creditors and maintaining harvesting operations. If they do not, then they face the risk of losing the Farm to foreclosure. Debtors' willingness to "bet the farm" on being able to make the plan payments is a persuasive demonstration of good faith.

Finally, Farm Credit argued that the plans do not comply with § 1225(a)(5). Under that subsection, if a secured creditor rejects the plan then it must retain its lien and be paid at least the value of its secured claim under the plan. The plans, as amended, provide that Farm Credit will retain all liens. If the debtors make the modifications suggested below, the Court finds that the plans will comply with § 1225(a)(5).

  D. <u>Needed Plan Modifications</u>.

The Court finds that the debtors' plans need to be modified to comply with § 1225.

    1. <u>"Clean-up" Plan Modifications</u>. First, there are a number of minor,

"clean-up" modifications that need to be made to make the plans unambiguous. Those modifications are set forth in the draft confirmation order (for the Bright Harvesting plan) attached to this opinion. The modifications set forth below would also be added to any confirmation order prior to entry.

2. <u>Treatment of CNH Capital, Western Bank, and Bank of the West</u>. Second, the plans are unclear as to whether a default would occur if the debtors failed to make any annual payments to CNH Capital, Western Bank of Clovis, or Bank of the West. The treatment of each of these creditors should be modified to include the following:

> If the debtor fails to make an annual payment by December 31 of any Plan year, it shall be in default.

3. <u>Treatment of Farm Credit</u>. Third, the treatment of Farm Credit's Line of Credit allows for minimum payments of $45,000 per year. This is not enough to amortize the loan over the life of the plan; an amortizing annual payment would be about $112,000 per year. Although Farm Credit is fully secured, its collateral base could erode substantially in five years. The Court believes the following language would fix this problem, so that the plans would comply with § 1225(a)(3), (a)(4), and/or (a)(5).

> Any Plan provision to the contrary notwithstanding, by December 31, 2018 Debtor must have paid Farm Credit at least $250,000 on the Line of Credit to avoid default, and by December 31, 2019, must have paid Farm Credit at least $325,000 on the Line of Credit Loan to avoid a default.

4. <u>Periodic Reporting</u>. Finally, Farm Credit seeks periodic reporting of debtors' operations. Although the requested reporting (monthly) seems excessive, the Court concludes that quarterly reporting to Farm Credit and the Chapter 12 trustee of each debtors' income and expense, on a cash basis and with sufficient detail, is reasonable.

### III. Conclusion

There is no guarantee the debtors will be able to complete their respective plan payments, but there is enough evidence in the record for the Court to find that the plans have a reasonable likelihood of success and are feasible.

The debtors should file with the Court, within 14 days after entry of this order, a written notice whether they agree to the proposed modifications outlined above. If they do, the Court will make the necessary changes to the proposed confirmation orders and enter the orders. Otherwise, the Court will enter orders denying confirmation of the plans.

/s/ David T. Thuma

Hon. David T. Thuma
United States Bankruptcy Judge

Entered: December 4, 2015.

Copies to:

Clifford C. Gramer, Jr.
3733 Eubank Blvd NE
Albuquerque, NM 87111

Samuel I. Roybal
500 Marquette, NW, Ste. 650
Albuquerque, NM 87102

Katharine C. Downey
P.O. Box 1945
Albuquerque, NM 87103

Allan L. Wainwright
800 Lomas Blvd NW
Albuquerque, NM  87102

Bright Harvesting, Inc.
3534 CR 15
Melrose, NM  88124

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

BRIGHT HARVESTING, INC.,                                           No.   15-11178-t12

    Debtor.

## DRAFT ORDER CONFIRMING CHAPTER 12 PLAN OF REORGANIZATION

    THIS MATTER came before the Court on November 6, 2015, for confirmation of the Debtor's Amended Chapter 12 Plan of Reorganization Dated October 6, 2015 (the "Plan"). Clifford C. Gramer, Jr., appeared for the Debtor; Samuel Roybal appeared for the Chapter 12 Trustee; and Ben Thomas and Katherine Downey appeared for Farm Credit and Production Credit Association of Southern New Mexico.  The Court, after reviewing the Plan and trial exhibits, hearing the testimony of witnesses, and being otherwise sufficiently advised, finds:

    A.    Debtor commenced this case by filing a voluntary petition under Chapter 12 on May 5, 2015.

    B.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 (b) and 1334.  This is a core proceeding.

    C.    The Debtor has retained possession of its assets as debtor-in-possession and is continuing to operate its harvesting business pursuant to Bankruptcy Code § 1203.

    D.    The Debtor has given proper and sufficient notice of the Plan, the hearing on confirmation of the Plan, and the deadline to object to the Plan, to all parties entitled to notice pursuant to Rule 2002(a)(8).

    E.    No further notice to any creditors or other parties in interest is necessary or appropriate in the circumstances, prior to entry of this order.

F. Objections to the Plan were filed by Farm Credit/Production Credit Association of New Mexico, Deere & Company, and the Chapter 12 Trustee.

G. There is good cause for the Plan term to be five years.

H. By agreement of the Debtor and the Chapter 12 Trustee, notwithstanding any language in the Plan to the contrary, between the confirmation date and the date the case is closed: (a) the Debtor will file operating reports quarterly and transmit copies of those reports to the Chapter 12 Trustee; and (b) all professionals retained by the Debtor shall file fee applications pursuant to 11 U.S.C. §§ 328 and 330. The Trustee may continue to pay interim compensation to such professionals to the extent provided in the orders approving their employment.

I. The Plan as amended by this Order complies with the requirements of the Bankruptcy Code including, but not limited to, the applicable requirements of 11 U.S.C. §§ 1222 and 1225.

THE COURT HEREBY ORDERS, ADJUDGES, AND DECREES:

1. The Plan is modified as follows:

   a. The following definitions are added to Article I:

Contingency Fund: up to 20% of income that otherwise would be considered Disposable Income, not to exceed a total of $5,000 at any time. The Contingency Fund shall be used solely for maintaining equipment and any unforeseen expense which Debtor incurs, or to make required payments to Class 3-10 creditors. On the Completion Date, all such Contingency Funds shall be turned over to the Trustee for distribution under this Plan, unless all claims have been previously paid in full.;

Disposable Income: [this definition replaces the definition in the Plan] All of the Debtor's income except for (1) expenses reasonably necessary for the continuation, preservation, and operation of the Debtor's business; (2) the payments required to be made by the Debtor to Class 3-10 creditors; and (3) any deductions necessary to create and/or replenish the Contingency Fund.

Plan Payments: [this definition replaces the definition in the Plan] Quarterly payments of Disposable Income due from the Debtor to the Trustee on January

-2-

25, April 25, July 25, and October 25 of each year until the Completion Date, starting January 25, 2016. If there is no Disposable Income in a particular quarter, the Plan Payment for that quarter would be $0.

      b.      Article 4 shall be deleted in its entirety and replaced with the following:

### Article 4

4.1 Payment in Full: This Plan provides for the payment of 100% of allowed claims, with interest.

4.2 Submission of Disposable Income: The Debtor shall pay to the Trustee all Disposable Income earned from the Effective Date through the Completion Date. Debtor shall establish an interest bearing account at a federally insured financial institution, into which it shall deposit all Disposable Income. Such income shall be paid to the Trustee quarterly, as Plan Payments. The Trustee shall use the Plan Payments to pay Class 1, Class 2, and Class 11 claims. The Trustee may pay such claims quarterly if funds are available. The Trustee shall pay Class 1 claims first, until they are paid in full, then shall pay Class 2 Claims until they are paid in full, and lastly shall pay Class 11 claims until they are paid in full. The Trustee may deduct his trustee fees from each payment made.

      c.      Article 5, paragraph 5.1 shall be deleted and replaced with the following:

5.1. Class 1: Allowed administrative expenses shall be paid by the Trustee from all Plan Payments he receives, until the expenses are paid in full. Payments to Class 1 claimants shall be pro rata, and shall commence upon receipt of the first Plan Payment. Payments to Class 1 claimants shall be completed before the Trustee starts paying Class 2 claims.

      d.      Article 5, paragraph 5.2 shall be deleted and replaced with the following:

5.2. Class 2: Allowed Priority Claims shall be paid by the Trustee from all Plan Payments he receives, until the claims are paid in full, with interest at the rate required by the Bankruptcy Code. Payments to Class 2 claimants shall be pro rata, and shall commence upon payment in full of the Class I claimants. Payments to Class 2 claimants shall be completed before the Trustee starts paying Class 11 claims. Allowed Priority Claims do not include Class 8 secured claims of the IRS.

      e.      Article 5, paragraphs 5.3, 5.4, 5.5, 5.6 [labeled "Class 6"], 5.7, 5.8, 5.9 and

5.10 are amended to make clear that the claims shall be paid by the Debtor "outside the plan;"

      f.      Article 5, paragraphs 5.6.2 and 5.7.9 of the Plan are amended to make

clear that the capitalized word "Collateral" refers to the Collateral defined in paragraph 1.18 of the Plan.

   g. Article 5, paragraphs 5.11.1--5.11.4 shall be deleted and replaced with the following:

> 5.11.1. Allowed Class 11 claims shall be paid by the Trustee in full, with 5% per annum simple interest. Payments shall come from the Plan Payments received by the Trustee. Payments to Class 11 claimants shall be pro rata, and shall commence after the Trustee has paid all Class 1 and Class 2 claims in full.
>
> 5.11.2. If allowed Class 11 claims have not been paid in full with interest one month prior to the Completion Date, or if there has been an uncured default on the Class 7 claim and Debtor liquidates the Collateral securing that claim, then, after payment in full of the Class 7 claim, Debtor will pay the Trustee the balance of the liquidation proceeds for use in paying Class 11 claims.

   h. Article 6 of the Plan shall be deleted and replaced with the following:

Article 6
Discharge

> Upon completion of all Plan Payments and payment in full of all creditors, the Debtor shall receive a discharge of all debts, except for any unpaid balance of Class 6 claim, which provides for payment over a period exceeding the period of the Plan, and which shall survive discharge.

   i. All references to "Annual Plan Payments" and/or "12 Plan Payments" are deleted.

  2. Any findings of fact that may constitute conclusions of law shall be treated as such, and vice versa.

  3. The Plan as modified by this Order is confirmed.

  4. The provisions of the Plan as modified by this Order shall bind the Debtor and holders of claims against the Debtor, whether or not the respective claims of such holders are impaired under the Plan, whether or not such holders have accepted the Plan, and whether or not

such holders have filed proofs of claim or are deemed to have filed proofs of claim.

       5.       With respect to any administrative claims of taxing authorities, the provisions of § 503(b)(1)(B) control in the event of any conflict with the Plan.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Copies to:

Clifford C. Gramer, Jr.
3733 Eubank Blvd NE
Albuquerque, NM  87111

Samuel I. Roybal
500 Marquette, NW, Ste. 650
Albuquerque, NM  87102

Katharine C. Downey
P.O. Box 1945
Albuquerque, NM  87103

Allan L. Wainwright
800 Lomas Blvd NW
Albuquerque, NM  87102

Bright Harvesting, Inc.
3534 CR 15
Melrose, NM  88124